# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LAURALEE HARPER,

        Plaintiff,

vs.                                                                No. CIV 05-113 JC/WDS

AZTEC MUNICIPAL SCHOOL DISTRICT
NUMBER 2, LINDA PAUL, in her individual
and official capacities, and KEN LYON, in his
Individual and Official capacities,

        Defendants.

## MEMORANDUM OPINION AND ORDER

        THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment, filed January 6, 2006 (*Doc. 45*). Having considered the Motion, the parties' submissions, the relevant authority, and being otherwise fully advised, I find the Motion well-taken and it is, therefore, granted.

**I.**        **Background**

        The following facts are either undisputed or deemed admitted pursuant to Local Rule 56.1(b). Plaintiff Lauralee Harper was employed by Aztec High School ("AHS") from 1995 until 2004, when she tendered her resignation. Harper began her career with AHS as Assistant Principal. In the 1999-2000 academic year, she became Principal of AHS and remained in that position until she resigned at the end of the 2004 academic year. Until the final year of her employment at AHS, Harper had consistently enjoyed favorable reviews and achieved statewide recognition for certain improvements

she made to its administration. Harper contends, however, that some of the changes she made were not well-received by all AHS faculty members and some "became emboldened after it became apparent Defendants had turned against [her]." Resp. at 2. [1]

In June of 2003, Defendant Ken Lyon was hired as Assistant Superintendent and, as such, became Harper's new supervisor. Harper recounts that shortly after Lyon was hired, he approached her concerning a proposed pay reduction for one of the secretaries. Lyon solicited Plaintiff's assistance in attempting to present the pay reduction, requesting that Harper work with him. Harper was not in favor of the reduction. The next significant interaction Plaintiff recalls having with Lyon occurred at the administrators' retreat in July of 2003. At that time, Lyon asked Harper to assist him in obtaining information to "support why [the secretary] should have...the money," and Harper was offended that Lyon had given her such a "directive" in front of her subordinates. Harper Dep. at 55:5-10, 61:1-14. Gail Jones, one of two Assistant Principals present for that discussion, believes Harper was disrespectful to Lyon on that particular occasion, though Jones more generally described Harper as a fine administrator. *Id.* at. 68:1-25, 69:1-25; Jones Dep. at 62:10-25, 63:1-21, 92:4-6, 113:1-4). Jones, commonly supportive of Harper, also described Harper as having been disrespectful to Lyon at an administrators' meeting, though Jones believed Harper to be justifiably agitated with Lyon on that occasion. *Id* at 14:4-16. Jones generally described the relationship between Harper and Lyon as a "power struggle." *Id.* at 88:8.

---

[1] Notwithstanding my Orders permitting the parties to exceed the page limits of Local Rule 7 (*Docs. 52, 63*), and the parties' proper stipulation to exceeding the page limits of Local Rule 10.5 (*Doc. 42*), I note that the briefing and exhibits presented in this matter are excessive in relation to the complexity of the issues. The Court has been challenged to identify the exhibits as referenced and marked, and has consumed significant time sorting through the voluminous deposition testimony in its effort to pinpoint that which is pertinent.

Defendants contend that Harper lacked respect for Lyon and, given her behavior toward him in public, others at AHS were aware of her feelings. [2] Defendants also assert that as Lyon became more familiar with the district employees over time, he learned that others in the AHS community also felt that Harper treated them rudely or insensitively.

On November 19, 2003, an administrators' meeting was held, the subject of which was how to resolve long-standing concerns involving a coach at AHS who had allegedly been engaging in misconduct and malfeasance. Present at that meeting were Ms. Harper, Superintendent Dr. Linda Paul, Mr. Lyon, and Ms. Jones. The topics of discussion involved the possible nonretention of the head football coach and its potential repercussions. The coach was believed to have, on more than one occasion, consumed alcohol and been intoxicated in the presence of students and even while traveling in a school vehicle. The coach was also rumored to have engaged in inappropriate social activity with female students. The facts underlying the rumors of the coach's behavior had been discussed by administrators on many other occasions, even for "several years" prior to this particular meeting. Jones Dep. at 101:6-102:12. Ms. Jones testified that the focus of the November, 2003 meeting was "whatever fallout there might be" from a decision not to renew, as opposed to the underlying facts supporting a decision in favor of nonrenewal. *Id.* At the meeting, Harper endorsed the coach's dismissal and while Lyon, being a new employee relative to the others present, did not

---

[2]For example, Richard Hill, Dean of Students at the high school, observed at his deposition that Harper "disrespected [Lyon's] abilities...discounted his authority...[and] mocked him as an individual as well as a professional." Hill Dep. at 56:21-25. Harper submits that Hill's *post hoc* observations are relevant only insofar as they tend to show pretext, for they were not offered in support of Defendants' concerns or comments regarding Harper's job performance until this litigation. The Court disagrees. While Hill's comments do not bear directly on the decision of the Court, Defendants were under no obligation to solicit opinions from Hill prior to identifying areas of concern with Harper's job performance in 2004.

contribute significantly to the discussion. Harper Dep. at 94:12-25, 95:1-10. Harper admits to asking Lyon the same question, verbatim, three times regarding what he planned to say if asked who made the decision. Harper was displeased with the way Lyon phrased his answer, so she kept asking. In reaction to Harper's tenacious questioning, Lyon left the meeting abruptly and was visibly upset.

On January 21, 2004, the final decision was made that the football coach's contract would not be renewed. Shortly thereafter, the coach actually resigned. The nonrenewal of his contract and resulting resignation generated interest among members of the Aztec community. It was the subject of several articles and letters published by the local newspaper. *See* Mot., Exs. C, E. Administrators were understandably reluctant to accept responsibility for the decision to terminate the coach because he was a very close friend of the AHS School Board President, Joe Price. Indeed, Price was disturbed about the decision and blamed Dr. Paul, Mr. Lyon, Plaintiff Harper, and Ms. Jones for the decision. Price Dep. at 13:11-14:24. Price testified that he first heard the news from Dr. Paul and he was "irritated and upset." *Id.* at 30:25. Harper believes that Price "considered the fired coach to be like a son, was extremely angry about the decision to fire him, and blamed [Harper] for this action." Resp. at 3. Harper further contends that Price approached AHS Superintendent Lyon and told him that Harper should be fired. *Id.* at 2-3. Jones testified that in June 2004, after Harper left AHS, Price approached Jones at a conference and said something analogous to "we got one principal and you're next." Jones Dep. at 61:4-62:9.

On February 20, 2004, in a memorandum, Defendant Lyon characterized aspects of Harper's job performance as unsatisfactory, referencing certain deficiencies in her ability to serve as an administrator in three particular competency areas. The memo came three months after the decision not to renew the coach's contract. In particular, the memo: (1) challenged Harper's respect for all

employees, alleging Harper had reprimanded custodian Jana Smith and then told her to "suck it up" when Smith began to cry; (2) challenged Harper's acceptance of diversity, alleging Harper had disparaged special education students by referring to them as "Brad's kids[3]"; (3) stated that Harper had refused to satisfactorily address the concerns of the School Board by telling Price he needed to communicate his concerns only in writing; and (4) referenced Harper's failure to attend a board meeting as expected on February 12, 2004.

Again, Harper's evaluations prior to that memo had always been positive. On February 20, 2004, shortly before a meeting was scheduled to take place between Harper and Lyon to discuss the issues at hand, Lyon's secretary distributed a survey (the "LEADNA" survey) to the mailbox of each high school teacher. Through that survey, views of Harper's leadership were solicited, though that is apparently not the usual purpose of the LEADNA survey. Harper learned of the survey and reacted by requesting that her own secretary assist her in removing the surveys from all the mailboxes, which the two women did without authority. Lyon later recognized that the procedure used regarding the LEADNA survey was flawed and agreed not to use the results in Harper's routine evaluation.

Harper did not attend the February 20, 2004 meeting with Lyon, but instead left school ill. On Monday, February 23, 2004, Harper and Lyon met, and Plaintiff tape-recorded the meeting. *See* Mot., Ex. S (transcript of 2/23/04 meeting). Plaintiff declined to respond orally to most of the questions Lyons posed at that meeting, stating that she would, instead, respond in writing.

Following receipt of Lyon's memorandum and the February 23 meeting, Plaintiff initiated a grievance and retained an attorney. Lyon responded to the grievance on March 17, 2004, wherein Lyon suggested that he had originally believed the parties could "collaboratively develop a PDP

---

[3]"Brad" refers to the special education teacher by the name of Brad Calvert.

5

[Professional Development Plan]," but had subsequently changed his mind and determined a PDP would not be required. Mot., Ex T. A PDP, as defined by state law and utilized by AHS at that time, was neither required of administrators nor disciplinary in nature. Lyon agreed to remove the February 20, 2004 memo, as well as a February 27, 2004 memorandum referencing it, from Harper's file. *Id.* Again, Lyon agreed not to use the LEADNA survey results in Harper's evaluation. *Id.* Lyon did suggest at that time that Harper use the LEADNA results "for thoughtful self-reflection...for understanding others' perceptions of [her]" and requested Harper's "written thoughts" on how she might improve in four stated competencies, noting that "[e]very person is capable of growth" and that her thoughts might assist Lyon in completing her routine evaluation. Id.

Harper, unsatisfied with Lyon's response and viewing his request for written thoughts as synonymous with requiring a PDP, appealed to Dr. Paul. Dr. Paul granted Harper's requests that she not be required to complete a PDP and that her evaluation be completed by April 5, 2004. Harper was then satisfied, according to her own testimony. *See* Harper Dep., Vol II at 52:1-16, 53:5-25, 54:1-2, 140:14-18. Harper's spring 2004 evaluation rated her "satisfactory" in every competency. Harper was upset, however, that Lyon inserted a comment therein, which read: "we will focus more specifically on the performance that is measured by Competency 2 and 3." Harper contends the comment constituted an impermissible "reinsertion" of the concerns from the February 20, 2004 memorandum which Lyon had agreed to remove from her file.

On April 12, 2004, Harper's contract for the following academic year was renewed. On April 15, Harper accepted the renewal contract. During that time, Harper also filed another grievance, contending that the comment in her evaluation "undid" the resolution of her first grievance and constituted an "attack" on her character. Policy provisions and revisions had been adopted by Aztec

6

School District No. 2 during regular meetings on December 11, 2003 and January 8, 2004. Harper was present at both meetings. The policy revisions were in effect at the time Harper filed her grievances. *See* Price Dep. at 53:22-3, 54:6-9; Paul Dep. at 27:1-21, 84:1-3, 146:1-152:12; Harper Dep., Vol. II at 57:2-16, 158:20-25. On April 29, 2004, the Board properly determined the issues Harper raised at that time were not grievable under the existing procedures.

Harper also applied for positions outside AHS for the coming academic year, notwithstanding her acceptance of a contract with AHS. It is unclear which came first, the contract acceptance or commencement of Harper's job search. Regardless, when Harper resigned from AHS, she had accepted a Principal position with the Dolores Colorado Schools, where she remains happily employed. Though living in rental housing at the time of her deposition, Harper and her husband own property in the Dolores area and held that property prior to the incidents at AHS leading to her resignation. In fact, Harper authored an article entitled *Goodbye, Aztec*, published in a local newspaper on June 1, 2004, explaining that she was leaving AHS because she and her husband owned land in Dolores and would be carrying out their "five-to-ten year goal to live on [their] property near Dolores." Mot., Ex. X. Harper later testified that she had been untruthful in the article regarding her motive for leaving AHS, though she affirmed her long-standing plans to build a home in Dolores.

Collectively, these events form the basis of Harper's assertion that she was "run out of the AMSD by the Defendants" after she reported wrongdoing on the part of Aztec's popular football coach and sought his dismissal from that position. In sum, Harper claims she was "forced to seek employment elsewhere in order to save her career in education and her own physical health." Resp. at 3. Harper filed her Complaint in the Eleventh Judicial District, County of San Juan, State of New Mexico, on December 29, 2004. She asserts claims for Breach of Contract and Covenant of Good

7

Faith and Fair Dealing (Count I); Promissory Estoppel (Count II); and Retaliation for the Exercise of First Amendment Rights Under 42 U.S.C. § 1983 (Count III). On February 3, 2005, Defendants properly removed the case to this Court pursuant to 28 U.S.C. §§ 1331 and 1441.

## II.     **Legal Standard**

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). For purposes of a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party. *Id*. The moving party has the initial burden of showing that there is no genuine issue of material fact. *Id.* at 256. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim, as "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).

Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson,* 477 U.S. at 248, 256. To meet this burden, the non-movant must specify evidence in the record and demonstrate the precise manner in which that evidence supports its claims. *Gross v. Burggraf*, 53 F.3d 1531, 1546 (10th Cir. 1995). Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Id.* If the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 597.

**III.      Discussion**

<u>Breach of Contract and Covenant of Good Faith and Fair Dealing (Count I)</u>

Harper asserts this claim against the School District for the actions of Paul and Lyon, alleging that the comment on her evaluation was "derogatory" and effectively reinstated the comments in the February 20, 2004 memorandum; that the processing of her grievance was not in accordance with published policies; and that she was constructively discharged based on the "harassment" of the February 20, 2004 memorandum and the comment in her Spring 2004 evaluation. Harper further asserts that the resolution of her first grievance "amended and supplemented" her written contract with the School District and that the "derogatory, unfounded, false information" contained in her evaluation created a breach thereof.

Defendants contend that the concerns addressed in the memorandum would have required improvement or discipline would result. On the other hand, the benign comments later made on Harper's routine evaluation are distinguishable in that they were merely suggestions attendant to a thoroughly positive evaluation. Defendants assert that if an employer cannot legitimately comment on an employee's evaluation that employer and employee shall "continue discussions" regarding two Competencies, and that "professional growth shall be encouraged," as it always is, an employee cannot be evaluated at all.

In short, the Court agrees with Defendants that the comments in Harper's routine evaluation were innocuous notations as opposed to disciplinary remarks pertaining to performance deficiencies, and reiterates that Harper was undisputedly privy to the procedural changes she complains were hidden from her. Thus, the Court finds no competent summary judgment evidence of breach or bad

9

faith on the facts before it. *See WXI/Z Southwest Malls v. Mueller*, 137 N.M. 343, 351 (2005). Accordingly, Count I is dismissed.

<u>Promissory Estoppel (Count II)</u>

Harper asserts this claim against all Defendants, alleging that policies and procedures were "concealed" from her, and that she relied on the published policies to her detriment. It goes uncontested that Harper abandoned her original grievance on the promise of Defendants Lyon and Paul that references to perceived shortcomings as detailed in the February memorandum would be removed from her file. Nonetheless, the aforementioned general comments were inserted in Harper's routine evaluation and, again, she claims it was Defendants' way of sliding the same criticism in through the back door, in defilement of the promise to remove it.

To make a prima facie case for promissory estoppel in New Mexico, one must show that: (1) an actual promise was made which in fact induced the promisee's action or forbearance; (2) the promisee's reliance on the promise was reasonable; (3) the promisee's action or forbearance amounted to a substantial change in position; (4) the promisee's action or forbearance was actually forseen or reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice. *See Khalsa v. Levinson*, 133 N. M. 206, 212, 62 P. 3d 297, 303 (N. M. App. 2002)

It is undisputed that Defendants Lyon and Paul indeed agreed to remove the memorandum and reference thereto from Harper's file, and that this agreement led Harper to discontinue pursuit of her initial grievance.[4] Together, these facts satisfy prong one. The Court finds Harper's argument

---

[4]Curiously, Harper appears to assert incompatible positions regarding whether she pursued one grievance or two. On the one hand, she claims the second grievance was merely a continuation of the first for purposes of procedural review, yet abandonment of her pursuit of the

deficient on prongs two and three, however, for it was reasonable only for Harper to believe the criticism of her job performance referenced in the memo would be removed from her file. It cannot be deemed reasonable for Harper to have relied on a mistaken belief that Defendants had relinquished all right to comment on her job performance at any time, in any manner. There is insuffucuent evidence to support Harper's theory that any agreement she made with Defendants provided her with complete immunity from even a benign comment[5] on an overwhelmingly positive routine evaluation.[6] Hence, on this record, enforcement of Harper's unreasonable belief to the contrary is not necessary to prevent injustice under prong four. Finally, the Court finds no credible evidence to support Harper's bald assertion that the new policies were somehow concealed from her, given the fact that Harper was present for their adoption. For these reasons, estoppel cannot provide a basis for imposing liability against Defendants.[7] Accordingly, Count II is dismissed.

Section 1983 Claim of Retaliation for Exercise of First Amendment Protections (Count III)

Harper contends that because she spoke out at the November 19, 2003 meeting in favor of

---

first grievance forms the crux of her contract-related claims.

[5]The full text of the comment is: "Ms. Harper and I will continue discussions about her administrative performance. We will focus more specifically on the performance that is measured by Competency #2 and Competency #3. Professional growth in these areas will be encouraged." Mot., Ex. V. The text of each Competency referenced is quoted on the evaluation form itself. *See Id.*

[6]Interestingly, Harper's current, thoroughly positive, evaluation from the Dolores School District reflects that markedly similar, arguably identical, areas for continued improvement have also been referenced by her present employer. *See* Mot., Ex. W.

[7]Insofar as Harper alleges equitable estoppel, "New Mexico courts have been reluctant to apply estoppel against the state and its agencies" and will do so only where "right and justice demand it." *Lopez v. State*, 122 N.M. 611, 617 (1996). Finding Defendants did not conceal the policies or procedures from Harper as alleged, the Court finds no basis for application of the doctrine under New Mexico law. *See Hagen v. Faherty*, 133 N.M. 605, 609-10 (2003).

the football coach's dismissal, she was subject to retaliation by Defendants in the form of the February 20, 2004 memo requiring what Harper alone refers to as a "disciplinary" PDP, subsequent negative comments in her employee file, and working conditions that led to her resignation, which she endeavors to portray as a constructive discharge.

The Supreme Court has held that the First Amendment protects statements by public employees even when such statements are directed at their employer, but only when the statements relate to matters of public concern. *See Pickering v. Board of Educ.*, 391 U.S. 563 (1968). Accordingly, the Tenth Circuit applies the *Pickering* test to ascertain whether an employment action impermissibly infringes on an employee's First Amendment rights. Under *Pickering*, the employee must show that (1) the speech in question involves a matter of public concern; (2) the employee's interest in engaging in the speech outweighs the government employer's interest in regulating it; and (3) that the speech was a substantial motivating factor behind the government's decision to take an adverse employment action against the employee. *See Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1271 (10th Cir. 1998). If an employee proves these three factors, then he must prevail unless the employer proves "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977). Prongs one and two are questions of law for the court to decide; prong three is a fact question for the jury. *See Bass v. Richards*, 308 F.3d 1081, 1088 (10th Cir. 2002).

A.  <u>Public Concern</u>

To ascertain whether speech touches on a matter of public concern, the Court must determine, as a matter of law, whether it can be fairly considered as relating to any matter of political, social, or

other concern to the community. *Connick v. Myers*, 461 U. S. 138, 146 ( 1983). This requires an analysis of the content, form and context of a given statement, as revealed by the record as a whole. *Id.* at 147-48. Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [the Defendants], in terms of content, clearly concern matters of public import. *Wulf v. City of Wichita*, 883 F. 2d 842, 857 (10th Cir. 1989). On the other hand, speech airing grievances of a purely personal nature does not enjoy protection. *Id.*

The narrow question is whether the February 2004 meeting at which Harper spoke involved (1) a discussion of any facts underlying the accusations about the coach's behavior; (2) merely a discussion about the possible repercussions following a decision not to renew; or (3) a combination of the two. The Tenth Circuit has made clear that an employee's motivation for speaking is important to the analysis of whether the speech pertained to matters of public concern." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000) ("In analyzing whether speech constitutes a matter of public concern, we may focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest."). Defendants contend the meeting's purpose was not to evaluate the underlying facts in support of nonrenewal, which had already been done, but instead to take action and address potential repercussions. In this way, the purpose of Harper's speech was job preservation. This, Defendants contend, renders Harper's speech of no public concern by virtue of its focus on personal concerns about fallout. Harper contends instead that the contract nonrenewal itself, which she claims was the main topic of discussion, clearly involved a matter of public concern, as evidenced in part by the ensuing newspaper articles and editorials and the buzz around AHS and the Aztec community at large.

13

Given the undisputed fact that the final decision for nonrenewable had not been made prior to the November 2003 meeting, it follows that the discussion at the meeting revolved in significant part around making and presenting that final decision, even if the administrators considered it a foregone conclusion. It is also uncontested that Plaintiff voiced her opinion that the contract should not be renewed. Lacking the specific words spoken, the Court determines from context that the content of Plaintiff's speech on the nonrenewal for alleged malfeasance on the part of AHS' football coach is protected, notwithstanding the meeting having morphed into a forum for airing individualized concerns about job security.

      B.     <u>Adverse Employment Action</u>

Assuming Harper's interest in speaking on the subject of the coach's alleged malfeasance outweighs any legitimate interest in regulating it under prong two of *Pickering*, as it surely does, and thus turning to *Pickering's* prong three, an employee alleging retaliation must show that his employer took some adverse employment action against him. S*ee Belcher v. City of McAlester*, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003) ("Implicit in the Pickering test is a requirement that the public employer have taken some adverse employment action against the employee."). The Tenth Circuit defines the phrase "adverse employment action" quite liberally, *Sanchez v. Denver Public Schools*, 164 F. 3d 527, 532 (10th Cir. 1998), and takes a case-by-case approach to whether a given employment action is adverse. *Gunnel v. Utah Valley State College*,152 F. 3d 1253, 1264 (10th Cir. 1998). Indeed, there are deprivations short of dismissal that will be considered adverse or detrimental employment actions in violation of an employee's First Amendment protections. *Schumer v. City of Boulder et al*,189 F. 3d 1304 (10th Cir. 1999). It is not the law, however, that all such acts, no matter how inconsequential, are sufficient to support a retaliation claim. *See Lybrook  v. The Members of the*

14

*Farmington Municipal Schools Board of Education*, 232 F. 3d 1334, 1340 (10th Cir. 2000).

In that vein, the PDP at issue here could not support Harper's First Amendment claim as a matter of law, even if it had not been withdrawn. In *Lybrook*, as a result of complaints from four teachers concerning the plaintiff, the school principal issued a PDP requiring, among other things, that the plaintiff "[s]trive to create an atmosphere that will nurture collaboration with all colleagues and to conduct affairs with a conscious concern for the highest standards of professional commitment." *Id* at 1339. The *Lybrook* plaintiff was subject to a further requirement of meeting with the principal every Monday morning per the PDP. Yet, even under a more burdensome PDP than the one proposed and withdrawn prior to implementation here, the Tenth Circuit affirmed the district court's conclusion that the PDP and its consequences were of insufficient gravity to premise a First Amendment violation. *Id*. at 1341. In light of that precedent, it is clear that even had it been implemented, the PDP issued to Plaintiff here cannot provide adverse employment action to support a First Amendment claim.

Insofar as Harper relies upon a theory of constructive discharge to establish adverse employment action, she must, of course, address the fact that her employment was not in fact terminated, for she tendered her own resignation. "[C]onstructive discharge is a doctrine that permits an employee to recast a resignation as de facto firing, depending on the circumstances surrounding the employment relationship and the employee's departure." *Gormley v. Coca Cola Enters.,* 109 P.3d at 282. It is the legal equivalent of a discharge and is available to assist a plaintiff in establishing, for example, a prima facie case where adverse employment action or termination is a required showing but plaintiff has resigned.

Plaintiff makes a rather general assertion that "Defendants created a work environment that

was so intolerable, a reasonable person would have decided that there was no alternative but to leave the employment of Defendant District, and resulted in the Plaintiff's constructive discharge." Compl. at 7. In this way, Harper attempts to show a pattern of retaliation culminating in her resignation. Yet the facts do not bear out her theory. Plaintiff was offered a renewed employment contract, which she accepted. She then authored an article detailing her decision to move to the Dolores area, where she and her husband had previously purchased land with the intent to build a home and reside. Harper's employment evaluation from the prior year was overwhelmingly positive--even stellar. On the facts as presented, viewed in the light most favorable to Harper, there is simply no competent evidence to support a theory of constructive discharge or any other adverse action sufficient to support a First Amendment claim. Therefore, Count III is dismissed.

### IV.    Conclusion

Finding no genuine issue in need of resolution at trial on Counts I and II, Defendants' Motion is granted as to those claims, which are dismissed with prejudice. Further finding that Plaintiff failed to make a prima facie case on her First Amendment claim for want of competent evidence establishing adverse employment action, Count III is also dismissed with prejudice.

WHEREFORE,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, filed January 6, 2006 (*Doc. 45*), is **GRANTED** and Plaintiff's Complaint is dismissed in its entirety with prejudice.

Dated this 2nd day of May, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:

>Elizabeth L. German, Esq.
>Brown & German
>Albuquerque, New Mexico

Attorney for Defendants:

>Duff Westbrook, Esq.
>Sanders & Westbrook, P.C.
>Albuquerque, New Mexico